IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| Fountain Leasing, LLC, ) | |
| ) | |
|     *Plaintiff*, ) | |
| ) | |
| v. ) | Case No.: 3:12-CV-397-PLR-CCS |
| ) | |
| Chester Adamson and Frank Ikerd, ) | |
| ) | |
|     *Defendants*. ) | |

**Findings of Fact and Conclusions of Law**

On July 30, 2012, Fountain Leasing, LLC filed this lawsuit against Chester Adamson and Fank Ikerd to enforce personal guarantees on leases for mining equipment that were in default. [R. 1]. After Ikerd failed to respond or otherwise defend himself, the Court entered a default judgment pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. [R. 22]. Shortly thereafter, the case was reassigned to the undersigned [R. 27], and a bench trial was conducted on August 19-20, 2015. For the reasons stated below, the Court finds in favor of Fountain Leasing.

**I.**

Ikerd Mining, LLC is a Kentucky coal mining company owned in equal share by Frank Ikerd and Chester Adamson. Frank Ikerd, a lifelong miner, handled the day to day management and operation of Ikerd Mining. Adamson, who lives in Florida, was essentially a passive owner. He only occasionally flew (on his personal Learjet) up to Somerset, Kentucky, to visit the mine, but otherwise left running the business up to Ikerd. [Trial Transcript (hereinafter "Tr.") 244-45].

Fountain Leasing is in the business of purchasing equipment that has usually been identified by a customer and then leasing the equipment to that customer. [Tr. 158-59]. In 2010, Frank Ikerd negotiated a pair of leases between Ikerd Mining and Fountain Leasing for an excavator (the "0901 Agreement") and dump truck (the "0908 Agreement"). Frank Ikerd signed the leases on behalf of Ikerd Mining. He also personally guaranteed both leases. Due to the size of the leases, Fountain Leasing required Chester Adamson to guarantee the leases as well. [Tr. 27-28, 35, 160]. Fountain Leasing made clear that it would not enter into either of the lease without Adamson's guarantees. [Tr. 206, 234]

Chester Adamson was not involved in the negotiations for either lease. [Tr. 149]. Fountain Leasing did not directly inform Adamson that he must guarantee the leases, [Tr. 234], and Fountain Leasing did not actually send the leases or guarantees directly to Adamson. [Tr. 224-25]. Instead, Fountain Leasing sent copies of the guarantees to Ikerd Mining's offices because "that is where all this originated from." [Tr. 225]. Fountain Leasing eventually received notarized guarantees for the 0901 and 0908 leases that bore Chester Adamson's (purported) signature. [Tr. 169-71].

In March 2011, Ikerd Mining became delinquent on its lease payments for both leases. [Tr. 172-173]. Fountain Leasing sent numerous letters and emails to Ikerd Mining, Frank Ikerd, and Chester Adamson informing that the leases were in default. [Plaintiff's Exhibit 3, 4, 5, 7, 9, 10, 11, 13, 15, 17, 19, 20, 21, 22, 23, 27, 28]. These communications were sent to various addresses of Adamson's, including his home and his scrap business "Allied Recyclers" in Florida, Adamson's email account "scrapismoney@aol.com" and a second email account that turned out to belong to his son "ertadamson@aol.com." [*Id.*] Lee Iglehart and Warren Payne of Fountain Leasing also testified that they had a phone call with Adamson on March 28, 2012,

during which Adamson confirmed that he had guaranteed the two leases. [Tr. 178-79, 229, Plaintiff's Exhibit 14]. Adamson never responded to any communication to deny guaranteeing either lease. [R. 177-78].

On July 30, 2012, Fountain Leasing filed suit against Adamson and Ikerd to enforce the guarantees. [R. 1]. Ikerd never responded to the lawsuit, and the Court entered a default judgment against him on September 24, 2013. [R. 22]. Adamson, on the other hand, did answer. [R. 8]. For the first time, Adamson asserted that the signatures on both documents were not his. [*Id.*].

## II.

Adamson does not contest that Ikerd Mining defaulted on the leases, and he does not contest the principal amounts owed under the leases. Instead, he contends that he never agreed to guarantee either lease, and that, despite his signatures appearing on the notarized guarantees, he did not sign them or authorize anyone to sign them on his behalf.

While the parties dispute whether it requires clear and convincing evidence or merely a preponderance of the evidence, they both agree that Adamson bears the burden of proving the invalidity of the signed guarantees. In this case, the Court need not reach whether clear and convincing evidence is necessary because Adamson has failed to prove the invalidity of the signatures by even a preponderance of the evidence.

Adamson's argument is as simple as it gets: he did not sign either document, and he did not authorize anyone to sign either document on his behalf. Adamson contends he was in Ft. Myers, Florida on the date the 0901 guarantee was purportedly signed. Adamson submitted a credit card statement showing charges in a Ft. Myers pizza restaurant that day as proof that he could not have been in Kentucky. [Defense Ex. 1]. Adamson also testified that he flew his

3

personal jet whenever he travelled. He submitted his jet's flight records to show that it did not fly to Kentucky around the time he purportedly signed the guarantees. [Defendant's Ex. 2, 2(a)]. Adamson challenges the notarizations of each document as technically deficient—thus not giving rise to the presumption that his signature is authentic on either document. Finally, while Adamson never actually offered a theory on how his signatures came to appear on the guarantees, he implied that someone at Ikerd Mining forged them out of desperation to get the equipment necessary to carry on their mining business.

All of that evidence does support Adamson's theory, but it is far outweighed by contrary evidence. This is true even if we give Adamson the benefit of the doubt and disregard the notarizations entirely. First, Adamson's implication that Ikerd Mining was desperate and might do anything to get the leases cuts both ways. Adamson invested a substantial sum of money into Ikerd Mining, and he owned half the business. If those leases were necessary to the continued health and viability of Ikerd Mining, then Adamson had just as much incentive as anyone to get the leases approved.

Second, despite testifying that he did not know anything about the negotiations over guarantees or leases, Adamson appears to have cooperated or directed others to cooperate with Fountain Leasing's due diligence prior to execution of the leases. This is evidenced by, among other things:

- One week prior to the date of the 0901 Lease Agreement, Adamson's accounting firm forwarded profit and lost statements for two of Adamson's other businesses to Rick Ikerd to forward to Fountain Leasing [TR. 163-64, Plaintiff's Ex. 29];
- Adamson, through Frank Ikerd, provided a bank reference with whom Lee Iglehart spoke prior to execution of the leases [Tr. 164];
- Fountain Leasing, through Ikerd, received additional financial statements, a copy of Adamson's driver's license, tax returns, and documents reflecting the values of Adamson's other businesses [Tr. 164-67 and associated exhibits];

4

Adamson testified that he did not know how all this personal financial information came into Ikerd and Fountain Leasing's possession. When questioned about why his accountant was emailing his personal financial information (not related to Ikerd Mining) to Frank Ikerd, Adamson stated that his accountant "pretty well" had the authority to release financial statements to anyone who called asking for them. [Tr. 277-78]. This strains credulity. For Adamson to claim that his Florida businesses and his accountants would have freely sent his personal financial information to Ikerd without his authorization is not believable. The Court is not persuaded by the argument that Adamson's financial information was obtained without his knowledge or consent.

Third, despite receiving numerous letters and emails from Fountain Leasing alleging that he was going to be liable as a guarantor for a substantial sum, Adamson never objected or claimed not to be a guarantor. When asked if he received the correspondence that was sent to his businesses in Florida, Adamson simply said he did not know or he did not remember. [*See, e.g.,* Tr. 303-05]. While some of the emails were apparently sent to Adamson's son Todd instead of Adamson himself, he acknowledged that others were sent directly to him. In fact, Adamson responded to one email to state that "I talk to frank every day and am well aware of the situation." [Plaintiff's Ex. 4]. Adamson is correct in his argument that he is under no obligation to defend himself from accusations of liability until a lawsuit is filed, but his decision to exercise that prerogative does not lend support to the his claim that he never agreed to guarantee the leases. The Court imagines that one would generally be quick to point out that they do not know anything about any guarantees if that is indeed the case.

The only evidence to support Adamson's argument that he did not agree to guarantee the leases relies on his own self-serving testimony. The credit card statement showing he bought

5

pizza in Florida around the time he was supposedly in Kentucky to sign the guaranty only helps him if he is the only person to use that credit card. And while Adamson testified that his wife could have testified that he was in Florida on the dates in question, he did not proffer her as a witness. [Tr. 319]. Likewise, the argument that his airplane's flight records evidence him not taking a trip to Kentucky only works in his favor if he only travels to Kentucky by personal jet. While Adamson testified that such is the case, nobody else did. In fact Ikerd testified that sometimes Adamson flew and sometimes he drove depending on the circumstances. [TR. 69-70].

In the end, Adamson has not carried the burden of establishing that the signatures on the leases are not his or were not authorized by him. Apart from the credit card statement and airplane flight records, the only evidence to support Adamson's position is his word. Adamson's testimony, however, was highly evasive and did not strike the Court as truthful. Adamson had as much incentive to enter into the two lease agreements as anyone at Ikerd Mining, his personal financial records were made available for Fountain Leasing's due diligence process, and Adamson failed to respond and object to the numerous demand letters he received preceding the filing of this lawsuit. This all easily outweighs Mr. Adamson's questionable testimony and two exhibits. Accordingly, the Court finds that Chester Adamson guaranteed both the 0901 and 0908 Leases. The Court further finds Chester Adamson to be in breach of both guarantees. The total amount of damages resulting from the breach is $1,376,004.81. [Tr. 195-96].

## III.

Fountain Leasing also seeks prejudgment interest and attorney's fees. Both lease agreements contain the following provision:

6

> 17. **ATTORNEY'S FEES.** In the event of any action at law or suit in equity in relation to this lease, Lessee, in addition to all other sums which Lessee may be called upon to pay, will pay to Lessor a reasonable sum for its attorney fees.

[Plaintiff's Ex. 1, 2]. On the other hand, both continuing guarantee agreements provide that "[i]n the event of default, your obligation would only be the outstanding principal indebtedness." [*Id.*]. These provisions are flatly contradictory. Under Tennessee law, ambiguous and doubtful language in a contract is construed against the drafter. *See, e.g.*, *Holston Valley Hosp. and Medical Ctr., Inc. v. Ashford Group Ltd.*, 661 F. Supp. 72, 74 (E.D. Tenn. 1986) (citing *Dairymen, Inc. v. Hardin*, 369 F. Supp. 1102, 1106-07 (E.D. Tenn. 1974); *Hanover Insurance Co. v. Haney*, 221 Tenn. 148 (Tenn. 1968)). Finding these two provisions to be irreconcilable, the Court will construe them against Fountain Leasing – the drafter. Accordingly, Adamson's liability will be limited to the outstanding principal indebtedness.

## IV.

Finding that Chester Adamson did guarantee Ikerd Mining's lease obligations for the 0901 and 0908 Leases, that Chester Adamson is in breach of his guarantees, and that the guarantees only apply to the outstanding principal indebtedness, a judgment order will be entered contemporaneously herewith in the amount of $1,376,004.81, to be offset by any monies recovered from the sale of the remaining underlying equipment.

**ENTER:**

*/s/ Pamela L. Reeves*
**UNITED STATES DISTRICT JUDGE**